# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DEBRA A. FOSTER, ) | |
|     Plaintiff, ) | No. 13 C 4690 |
| ) | |
| v. ) | |
| ) | Magistrate Judge Geraldine Soat Brown |
| CAROLYN W. COLVIN, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
|     Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debra A. Foster brings this employment discrimination action pursuant to 42 U.S.C § 2000e (Title VII) and 29 U.S.C. § 791 (the Rehabilitation Act). Before the court is defendant Acting Commissioner of the Social Security Administration Carolyn Colvin's Motion for Summary Judgment. (Def.'s Mot.) [Dkt 66.][1] For the reasons set out here, the motion is granted.

## JURISDICTION

There is subject matter jurisdiction under 28 U.S.C. § 1331 because the matter arises under

---

[1] Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(a), the Commissioner has filed a Statement of Material Facts (Def.'s Facts) [dkt 70] and a memorandum of law in support of her motion (Def.'s Mem.) [dkt 67]. Because plaintiff Debra Foster is proceeding *pro se*, the Commissioner also served a Notice to Pro Se Litigants Opposing Summary Judgment, pursuant to Local Rule 56.2. (Def.'s Notice.) [Dkt 69.] Foster filed a response to Defendant's Statement of Material Facts (Pl.'s Fact Resp.) [dkt 85] and a memorandum response (Pl.'s Resp.) [dkt 84]. The Commissioner replied. (Def.'s Reply) [Dkt 86.] Although Foster was not given leave to file a sur-reply, she did so. (Pl.'s Sur-Reply) [Dkt 87.] Foster also refiled exhibits [dkt 88] which appear to be identical to the exhibits filed with Plaintiff's Response to Defendant's Statement of Material Facts [dkt 85] and Plaintiff's Sur-reply [dkt 87].

42 U.S.C. § 2000e *et seq.* and 29 U.S.C. § 791 *et seq.* The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. [Dkt 29.]

**BACKGROUND**

Foster, an African American woman, was hired by the Social Security Administration (the "SSA") as a claims authorizer at the GS-7 level in May 2010. (Def.'s Facts ¶ 4; Ex. 3.) In May 2011, she was promoted to a claims authorizer at the GS-9 level. (Def.'s Facts ¶ 5; Ex. 4.) As far as the record reflects, Foster is still employed by the SSA.

<u>Foster's claim and exhaustion of administrative remedies</u>

Prior to filing an action under Title VII in federal court, a complaining federal employee must first meet "with the employing agency's EEO [Equal Employment Opportunity] Counselor to attempt to resolve the complaint amicably." *Moreland v. Johnson*, 806 F.3d 961, 966 (7th Cir. 2015) (citing 29 C.F.R. § 1614.105(a)). If a resolution is not reached, "the complainant is issued a Right to File a Formal Complaint letter, and can then file a complaint with the employing agency." *Moreland*, 806 F.3d at 966 (citing 29 C.F.R. § 1614.105(d)). The agency determines whether the case is procedurally proper and, if so, conducts an investigation and informs the complainant that she can request a hearing or an immediate final decision. *Moreland*, 806 F.3d at 966 (citing 29 C.F.R. §§ 1614.107, 1614.108(a), (f)). If a hearing is requested, the employing agency then decides whether to adopt the administrative judge's decision as its final decision. *Moreland*, 806 F.3d at 966-67 (citing 29 C.F.R. § 1614.110). Once a final decision has been issued, the employee has the right either to appeal to the EEOC or to file a civil action. 29 C.F.R. §§ 1614.110(a), 1614.407(a).

Filing a civil action in the district court terminates the processing of an appeal by the EEOC. 29 C.F.R. § 1614.409. When filing a lawsuit, a plaintiff may only pursue "those claims that could reasonably be expected to grow out of the administrative charges" and cannot bring any new claims into the lawsuit. *Reynolds v. Tangherlini,* 737 F.3d 1093, 1101-02 (7th Cir. 2013).

Foster sought EEO counseling on March 1, 2011, and received a "Notice of Right to File" on March 25, 2011. (Def.'s Facts, Ex. 21, EEOC Decision at 2.) Foster filed a formal complaint on April 2, 2011, alleging discrimination on the basis of race and sex, alleging that she was unfairly given negative feedback in evaluations and insufficient training, treated poorly by her mentor, and denied a new mentor. (*Id.*) In June 2011, Foster amended her complaint, adding that she was also discriminated against because of her disability and EEO activity. (*Id.*) An investigation took place between June 3 and September 6, 2011, and the report was submitted October 7, 2011. (Def.'s Facts, Ex. 1, Report of Investigation at 2.) Foster then requested a hearing, and she and the SSA both moved for summary judgment in August 2012. (*Id.* at 2.) In December 2012, the administrative judge granted the SSA's motion for summary judgment and denied Foster's. (EEOC Decision at 13.)[2]

The SSA adopted the administrative judge's decision in March 2013, and Foster filed the present lawsuit in June 2013. (Compl.) [Dtk 1.] In the course of the lawsuit, Foster attempted to assert a number of new claims. (Pl.'s Initial Status Rept at 1.) [Dkt 35.] The court entered an order

---

[2] It appears that no evidentiary hearing was held and the administrative judge based her ruling on the parties' motions. (EEOC Decision at 1-13.)

3

defining the claims at issue in this case and excluding claims as to which Foster had not exhausted the administrative process. (Order, Jan. 20, 2015.) [Dkt 61].³

Foster's motions for attorney representation and the SSA's motion for summary judgment

Foster's first motions for leave to proceed *in forma pauperis* [dkt 18] and for attorney representation [dkt 3] were denied by the district judge [dkt 20]. Her second motions for leave to proceed *in forma pauperis* [dkt 42] and for appointment of counsel [dkt 43] were denied by this court [dkt 44]. In her motions, Foster did not argue that she was unable to represent herself. On the contrary, she stated that she has a post-graduate degree. (Pl.'s Mot. Attorney Rep. ¶ 5.) [Dkt 3.] Foster is also an experienced pro se litigant. *See Foster v. Bd. of Educ. of City of Chicago*, 611 Fed. Appx. 874 (7th Cir. 2015).

The SSA filed its motion for summary judgment in June 2015. [Dkt 66.] After an initial briefing schedule was set, Foster requested and was allowed three extensions of time to respond. [Dkt 77, 80, 83.]⁴

---

³ "The following claims are not part of this lawsuit: Claims of discrimination on the basis of age, color, national origin, religion, failure to accommodate a disability, claims relating to alleged denial of workers compensation, the 2013 government shut down and the consequent furloughing of federal employees, the 2014 denial of a within grade salary increase, and an alleged failure to promote plaintiff." (Order, Jan. 20, 2015.)

⁴ Notwithstanding the extensions granted her, Foster's Response to Defendant's Statement of Material Facts fails to comply with the Northern District of Illinois Local Rule 56.1(b)(3), which requires that the non-movant's response contain:

(A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and
(B) a response to each numbered paragraph in the moving party's statement, including, the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and

# FACTS

Foster testified that she was diagnosed with depression over 30 years ago and previously received Social Security disability benefits for it. (Def.'s Facts ¶ 14; Def.'s Facts, Ex. 2, Dep. of Debra Foster at 128-30, 133.)[5] She was hired by the SSA on a "ticket to work" program for individuals with disabilities, and a human resources employee, Bill McClinton, was the only SSA employee who was aware of her disability. (Def.'s Facts ¶ 15; Foster Dep. at 119, 125-27, 276-77.)[6] Foster knew that, for privacy reasons, her disability would not be revealed, and she concedes that she never revealed her disability to anyone else at the SSA or requested an accommodation for it. (Def.'s Facts ¶¶ 16-18; Foster Dep. at 125-28.)

---

> (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

The purpose of that rule is to allow the court to see in one document what is disputed and undisputed and where the supporting evidence is located. Foster did not do that. She did not give a concise summary, she admits or ignores most of defendant's facts, and appears to have included her own set of facts in her responses to Defendant's Statement of Facts. Additionally, she has cited to entire lengthy exhibits rather than specific pages within those exhibits, making it difficult for the court to determine on what evidence she relies. Therefore, unless otherwise indicated, the facts in Defendant's Statement of Facts are deemed admitted. *Friend v. Valley View Cmty. Unit Sch. Dist. 365U,* 789 F.3d 707, 710-11 (7th Cir. 2015); *Cady v. Sheahan,* 467 F.3d 1057, 1061 (7th Cir. 2006); *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803 (7th Cir. 2005); *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817-18 (7th Cir. 2004). The court has, however, to the extent possible, reviewed Foster's response and exhibits in an effort to see whether Foster has included evidence sufficient to establish a genuine dispute about any material fact.

[5] There is some confusion about when Foster was diagnosed with depression as well as when she received benefits. (Foster Dep. at 128-35.)

[6] Foster mistakenly referred to McClinton as Clinton at her deposition. (Foster Dep. at 119.)

5

In her position as a claims authorizer, Foster determines eligibility for non-disability benefits. (Foster Dep. at 19, 21, 23-25.) Bernard Mull, an African American male, supervised Foster until he was transferred in May 2011. (Def.'s Facts ¶ 7; Foster Dep. at 28-29.) Thereafter, Daphne Glass, an African American female, supervised Foster. (Def.'s Facts ¶ 8; Foster Dep. at 28-29.) Beauty Jackson, an African American female, was the module manager and Foster's second line manager. (Def.'s Facts ¶ 9; Pl.'s Fact Resp., Ex. 2 at 22.) By June 2011, after a year of service, Foster received an automatic promotion and a nearly $10,000 raise. (Def.'s Facts ¶ 4; Foster Dep. at 35-38; Def.'s Facts, Ex. 4.) Foster admits that she did not apply for another position or promotion within the SSA. (Def.'s Facts ¶ 6; Foster Dep. at 30-31.)

Foster participated in SSA training from May 2010 to January 2011 with eleven others including five African American women. (Def.'s Facts ¶¶ 19-20; Foster Dep. at 137-39, 159.)[7] Foster had the second lowest overall average (90.34%) in her training class. (Def.'s Facts, Ex. 5 at 000940.) She received scores lower than 70% on eight topics, with her lowest score being 20% on one test. (Def.'s Facts ¶ 24.) All trainees who scored lower than 70% on any test were offered tutoring. (Def.'s Facts ¶ 23; Foster Dep. at 151-52, 154.) Foster accepted the one-on-one tutoring on all eight topics in which she scored below 70%. (Def.'s Facts ¶ 24; Foster Dep. at 150-56; Def.'s Facts Ex. 5 at 00941-44; Def.'s Facts, Exs. 6-13.) She was not the only person in her training class to be offered tutoring. (Def.'s Facts ¶ 24; Foster Dep. at 154.) Foster testified that while all of the trainees received the same training, many trainees, including African American males and females, got more help than she did. (Foster Dep. at 142-46.) After completing training, Foster was the only

---

[7] In her response, Foster states that there were thirteen trainees in her class: five African American women, two African American men, two Caucasian women (one of whom dropped out), one Hispanic man, one Asian woman, and one man of unidentified ethnicity. (Pl.'s Resp. at 6.)

member of her training group assigned to work in Module 15. (Def.'s Facts ¶ 25; Foster Dep. at 69, 139-40; Def.'s Facts, Ex. 14 at 000617.)

Foster has had four different mentors since joining Module 15. (Foster Dep. at 205-06.) She testified that she worked well with her first mentor, Jeff Patchett, a white male with whom she worked for approximately two months. (Foster Dep. at 107-09, 205, 207-09.) Foster started working with her second mentor, Daniel Tokarz, a white male, in February 2011 when Patchett was reassigned. (Foster Dep at 209-11.)[8] He gave Foster refresher training at her request. (Def.'s Facts ¶ 26; Foster Dep. at 43-44, 166-67; Def.'s Facts, Ex. 15 at 000617.) Foster stated that Tokarz did not grade her work appropriately, was a poor communicator, and raised his voice to her. (Def.'s Facts ¶ 37; Foster Dep at 211-12.)[9] In February 2011, Foster requested a new mentor. (Pl.'s Fact Resp., Ex. 1 at 41-42, 47-49.) In March 2011, Foster started working with a new mentor, Theresa Gray, an African American female. (Def.'s Facts ¶ 39; Foster Dep. at 42-43, 217-18.)[10] In May 2011, Foster received additional training from Gray that was not part of the standard program. (Def.'s Facts ¶¶ 29-30; Foster Dep. at 168-69; Def's Facts, Ex. 14 at 000617; Pl.'s Fact Resp., Ex. 2 at 51.) Gray reported that Foster had trouble grasping concepts covered in training, while Foster complained that Gray had difficulty communicating, took too long to return Foster's work, unfairly

---

[8] Emails indicate that Tokarz was assigned as Foster's mentor in January 2011. (Def.'s Facts, Ex. 14 at 000493.)

[9] In an affidavit taken as part of the SSA investigation, Mull stated that his desk is near Tokarz and heard many of the interactions Tokarz had with Foster. (Pl.'s Fact Resp., Ex. 1 at 13.) Mull stated that Tokarz has a deep voice and did not raise his voice to Foster, but that on many occasions, she raised her voice to Tokarz and once to Mull. (*Id*. at. 13-14.)

[10] According to Foster, her direct supervisor Mull did not approve her request for a new mentor. (Foster Dep. at 214.) Her request for a new mentor was approved after she complained to upper-level manager, Barbara Harris. (Foster Dep. at 215-16; Pl.'s Fact Resp., Ex. 1 at 41-42.)

7

graded her work, and used an inappropriate tone as a result of Foster's complaint. (Def.'s Facts ¶¶ 40-42, 56; Def.'s Facts, Ex. 17 at 000327.) Foster and Gray met to discuss their communication and tone, which improved thereafter. (Def.'s Facts ¶ 41; Foster Dep. at 221-23.) After the training, Gray noted that Foster was released to work on a full range of cases even though she was still struggling to grasp certain concepts. (Def.'s Facts ¶ 29; Foster Dep. at 190; Def.'s Facts, Ex. 17 at 000327.)[11]

Foster remained unhappy with Gray and again requested and received a new mentor, Anne Coleman-Webb, an African American female, in May 2011. (Def.'s Facts ¶¶ 44-45; Foster Dep. at 45-46, 226-28.)[12] Foster stated that Coleman-Webb helped her by working on a case with her and referring her to the Program Operations Manual System ("POMS"), a typical training technique. (Def.'s Facts ¶¶ 47-48; Foster Dep. at 231-33.) Foster did not like being referred to POMS or the pace at which her work was evaluated, so she requested another mentor in March 2012. (Def.'s Facts ¶¶ 47, 49, 50; Foster Dep. at 233-35, 239.) The SSA denied Foster's request because Foster had already had multiple mentors. (Def.'s Facts ¶ 50; Foster Dep. at 240.) In May 2012, Foster stated that Coleman-Webb improved in grading and returning her work more promptly. (Def.'s Facts ¶ 51; Foster Dep. at 236-37.)

In October 2011, the SSA gave Foster an annual performance review. (Def.'s Facts ¶ 59; Foster Dep. at 244-45.) In each of the two areas evaluated, "Engages in Learning" and "Interpersonal Skills," Foster received a numeric rating of 3, and she received a summary rating of

---

[11] Foster believes that she does not work on a full range of cases and has noticed that other people in her in her training class, including African American females, work on a wider variety of cases than she does. (Foster Dep. at 191-93.)

[12] At the time of Foster's deposition in May 2012, Coleman-Webb was still serving as Foster's mentor. (Foster Dep. at 206.)

"Successful Contribution." (Def.'s Facts ¶¶ 60, 64; Foster Dep. at 259-60; Def.'s Facts, Ex. 20 at 000045-46.)[13] In the narrative portion of the "Engages in Learning" section of the review, the SSA reported that Foster struggled with certain cases, had not demonstrated consistent progress, had difficulty independently performing a majority of her workload, made repetitive errors, rushed through her work to meet productivity goals, and was not making "satisfactory progress towards becoming a proficient Claims Authorizer." (Def.'s Facts ¶ 61; Def.'s Facts, Ex. 20 at 000045.) For reasons that are not clear, the evaluation states that the SSA was "contractually obligated" to give Foster a Level 3 rating despite the comments suggesting her performance was not satisfactory. (Def.'s Facts, Ex. 20 at 000045.) Foster acknowledged that she could not process more technical cases and that she had not satisfactorily demonstrated technical concepts, but believes that was due to insufficient training. (Def.'s Facts ¶ 62; Foster Dep. at 248-59.)

Foster asked for refresher training on each of the eighteen available topics in October 2011. (Def.'s Facts ¶ 31; Def.'s Facts, Ex. 18.) Steve Salmon, senior claims processing specialist, gave Foster and two others that refresher training, which consisted of 22 sessions in November and December 2011. (Def.'s Facts ¶ 32; Foster Dep. at 195-96; Def.'s Facts, Ex. 19 at 000519-24.) Foster testified that she thought that Salmon's training should have covered more topics. (Foster Dep. at 198-99.) Salmon reported that Foster struggled "to grasp concepts and apply them consistently." (Def.'s Facts ¶ 58; Def.'s Facts, Ex. 19 at 000527.)[14] Despite this training, Foster's

---

[13] Foster refused to sign her evaluation. (Def.'s Facts Ex. 20 at 000046.)

[14] Salmon noted that all of the trainees were attentive and engaged during the training, but that each of them also struggled to "learn, retain and properly apply the concepts involved in the [claims authorizer] job." (Def.'s Facts, Ex. 19 at 000527.)

9

progress did not improve and her monthly progress reports reflect significant continuing problems. (Pl.'s Fact Resp., Ex. 1 at 135-61)[15]

As noted above, in June 2011, Foster was promoted to a claims authorizer at the GS-9 level. (Def.'s Facts ¶ 5; Ex. 4.) With that promotion, Foster received a raise of almost $10,000. (*Id*.)

## FOSTER'S CLAIMS

<u>Allegations of Disparate Treatment on the Basis of Race, Sex, and Disability</u>

Foster believes that she did not receive adequate training or mentorship to perform effectively because of her race, sex, and disability. (*See* Foster Dep. at 66-68, 70, 203, 230.) The SSA maintains that Foster was not harassed or discriminated against, that she received equitable training, and was not being treated differently from any other trainee who had similar errors and productivity level. (*See* Def.'s Mem. at 1.)

Foster states that she was treated differently from other employees of different ethnicities, and specifically claims to have been treated less favorably than a Caucasian male trainee, Robert Schipits, who came into her module from a different training class. (Foster Dep. at 70-72, 206-07.)[16] She testified that Schipit's mentor would sit with him and that he could ask anyone for assistance, but her mentor would not sit with her and she could only ask her mentor for help – until Foster filed her EEO grievance and a letter to management complaining about not receiving adequate training.

---

[15] *See, e.g.,* Monthly Progress Interview for February 2012, reporting that Foster's lack of work performance was a "critical concern and must improve immediately." Of the 53 cases Foster processed, she had "ten payment errors, six notice errors, two documentation errors and twelve technical errors." (Pl.'s Fact Resp., Ex. 1 at 143.)

[16] The spelling of "Schipits" is taken from the affidavit of Beauty Jackson. (Pl.'s Fact Resp., Ex. 2 at 25.) His name is spelled several different ways in Foster's deposition.

(Foster Dep. at 71.) In an affidavit submitted as part of the SSA investigation, Beauty Jackson stated that she observed Schipits receiving the same direction and treatment from mentors as Foster did. (Pl.'s Fact Resp., Ex. 2 at 25.) Foster testified that she observed others from her training class, including African American females, receive one-on-one assistance from their mentors and believes she should have received that same attention, while the SSA states that Foster received more training than her colleagues, including refresher training that they did not get. (Def.'s Facts ¶¶ 33-34; Foster Dep. at 201-03, 207.)

Allegations of Retaliation

Foster alleges that she was retaliated against after she complained to a training coordinator about a comment her instructor made about the Obama Administration in June 2010. (Def.'s Facts ¶ 65; Foster Dep. at 78-85.) Foster believes the instructor began to treat her unfavorably after she complained, but does not know whether the coordinator informed the instructor of her complaint. (Def.'s Facts ¶ 65; Foster Dep. at 85-86.) Foster also believes the mis-grading of one of her tests was an act of retaliation, even though she admitted that the instructor also mis-graded other trainees' tests. (Def.'s Facts ¶ 66; Foster Dep. at 90-92.) Foster further alleges that the SSA retaliated against her by not allowing her to take a make-up exam; after she complained, however, Foster was allowed to take the exam. (Def.'s Facts ¶ 67; Foster Dep. at 93-94.)

Foster alleges that she was retaliated against by not receiving any work in the first four days she was assigned to Module 15 after training. (Def.'s Facts ¶ 68; Foster Dep. at 101-04.) Foster agrees, however, that during those four days, her supervisor was working with management to determine what sort of work she should be assigned. (Def.'s Facts ¶ 68; Foster Dep at 101-04.)

11

Foster believes she was considered a target before she arrived in Module 15 because Mull denied her request for a new mentor. (Def.'s Facts ¶ 68; Foster Dep. at 106-07.) Finally, Foster believes that the SSA retaliated against her because it gave a wider array of cases to her colleagues (who are also African American females). (Def.'s Facts ¶¶ 20, 70; Foster Dep. at 191-93.)

Foster also testified that she was retaliated against because she filed the EEO complaints in March and April 2011. (Def.'s Facts ¶ 69; Foster Dep. at 109, 224.) She believes that she was treated worse after the filing. (Foster Dep. at 109.) Specifically, Foster stated that her mentors, Theresa Gray and Annie Coleman-Webb, took an unreasonable amount of time to return Foster's work. (Def.'s Facts ¶ 69; Foster Dep. at 110, 224-26.) When she received work back late from her mentors, Foster complained to her supervisor, but never said anything directly to her mentors, because she did not feel that it was her responsibility to do so. (Foster Dep. at 111, 235-36.) Foster also contends that after she filed her complaint, her mentors stopped answering her questions and told her to review POMS instead. (Foster Dep. at 112.)

> On the other hand, Foster states:
>
> Plaintiff admits that harsh grading and not getting her cases back promptly occurred both before and after she filed her EEO complaint. Plaintiff further agrees that she did not get the adequate training from her mentor until after she filed her EEO complaint and submitted a letter to management about not receiving appropriate training or assistance.

(Pl.'s Fact Resp. ¶ 69.) A memo summarizing Foster's performance from a time period prior to the complaint describes her progress as unsuccessful, while a memo written subsequent to her EEO complaint notes some improvement. (Pl.'s Fact Resp., Ex. 1 at 54-62.) Foster also received performance memos after she filed the EEO complaint which indicate that she was not improving. (Pl.'s Fact Resp., Ex. 1 at 120-22.)

Directions About Timekeeping

When Foster started working at the SSA, her supervisor Mull told her to record eight hours on her time sheet to indicate that she had worked a full day. (Def.'s Facts ¶ 71; Foster Dep. at 264-66.) Foster noticed that others recorded seven-and-a-half hours not eight, but did not know if Mull directed those individuals to record seven-and-a-half or eight hours. (Def.'s Facts ¶ 71; Foster Dep. at 265-66.) When Glass began supervising Foster, she directed Foster to record seven-and-a-half hours on her time sheet when she worked a full day. (Def.'s Facts ¶ 71; Foster Dep. at 268.) Foster admits that she was not denied a promotion or transfer because of her timekeeping, and that no manager has ever made an issue about her productivity due to her timekeeping. (Def.'s Facts ¶ 71; Foster Dep. at 270-71.)

**LEGAL STANDARD**

Summary judgment on all or part of a claim or defense is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. Fed. R. Civ. P 56(c)(1). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the responsibility of identifying applicable evidence. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences

in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. The court may not make credibility determinations, "choose between competing inferences," or weigh the evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005).

**DISCUSSION**

Title VII prohibits discrimination against an employee on the basis of the employee's race, color, religion, sex, or national origin, and prohibits retaliation against an employee because the employee has engaged in a protected activity such as making a charge of discrimination. 42 U.S.C. § 2000e-2 and § 2000e-3; *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014). A plaintiff can prove either of these claims under the direct or indirect method. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Under the direct method of proof, the plaintiff makes her case by pointing to evidence directly showing that her employer subjected her to an adverse employment action" on the basis of race, sex, or disability. *Id*. Under the indirect method, the plaintiff must establish that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employers' legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). "Retaliation claims may also proceed under direct and indirect methods of proof; rather than proving that she was a member of a protected class, the plaintiff must prove that she engaged in a statutorily protected activity." *Andrews*, 743 F.3d at 234.

The SSA argues that summary judgment should be granted because: (1) Foster did not suffer an adverse employment action as a result of unlawful discrimination and does not provide evidence of one (Def.'s Mem. at 9); (2) Foster has not demonstrated that similarly situated employees outside her protected class were treated more favorably (*id*. at 12); (3) there is no evidence of retaliation against Foster, in fact, she received additional training after she filled her EEO complaint; (4) Foster's complaint about her instructor's comment regarding the Obama administration is not protected activity (*id.* at 11-12); and (5) even if Foster had established a *prima facie* case of discrimination or retaliation, the SSA would still be entitled to summary judgment because it has articulated legitimate, non-discriminatory reasons for its actions and Foster cannot show that any of these reasons are pretext (*id.* at 14).

An essential element of Foster's claims is proof that she has been subjected to a materially adverse employment action because of her race, sex, or disability, or in retaliation for a protected activity. *Andrews*, 743 F.3d at 234-35. "'[U]nfair reprimands or negative performance evaluations, unaccompanied by some *tangible* job consequence, do not constitute adverse employment actions.'" *Jones v. Res-Care, Inc*., 613 F.3d 665, 671 (7th Cir. 2010) (emphasis in original) (quoting *Grube v. Lau Industries, Inc.,* 257 F.3d 723, 729 (7th Cir. 2001)).

> While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Although the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm.

*Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) (citations and quotations omitted). "A plaintiff's subjective determination of tension in the workplace, without more, cannot constitute an adverse employment action absent a tangible job consequence." *Jones*, 613 F.3d at 671.

Foster complains of negative evaluations (Pl.'s Mem. at 4), but the Seventh Circuit has "never held, and in fact has explicitly rejected, that poor performance reviews alone can be the basis of a finding of an adverse employment action by the employer." *Chaib*, 744 F.3d at 984 (citations omitted).

Foster claims that the SSA failed to change her status from "trainee" to a "full Claims Authorizer Journeyman." (Pl.'s Resp. at 1, 4.) She asserts that, because of her trainee status, she is not allowed overtime and compensatory time. (Pl.'s Fact Resp. ¶ 5.) Foster directs the court to what appear to be pages of an employee policy or handbook (Pl.'s Facts Ex. 1 at 3-9), but none of those pages suggest that "trainee" status deprives Foster of any benefit.

Although refusing or failing to train an employee based on that employee's membership in a protected class can be an adverse action, *Chaib*, 744 F.3d at 982, there is no evidence that the SSA refused or failed to train Foster. Rather, the facts show she was given the same training as other trainees, as well as one-on-one tutoring, refresher training, and four different mentors. She is simply dissatisfied with the training she did receive. Furthermore, there is a complete lack of evidence that any problems Foster had with training were caused by discrimination based on her race, sex, or disability. The facts described above show that many of the problems Foster complains of were experienced by others, but she admits that the other trainees – including African American women – are performing successfully. (Pl.'s Fact Resp. ¶ 35.)

Likewise, there is no evidence of any adverse action as a result of her EEO complaint. After she filed her complaint in April 2011, Foster received a promotion and a raise, additional one-on-one training by her then-mentor Theresa Gray, refresher training on 18 topics, was released to work on a full range of cases (in spite of some deficiencies in performance), and was granted a new mentor

after she complained about Gray. Her complaints about her training are essentially the same before and after the complaint. She testified that in a number of instances she received better treatment after her complaint. For example, she complains that Schipit was treated better – until she filed her EEO complaint and sent a complaining letter. There is simply nothing that shows any retaliatory action by the SSA.

The same is true of Foster's claim that she was subjected to retaliation for complaining in June 2010 about a remark made by an instructor about the Obama administration. Although Foster asserts her belief that she was treated unfavorably by the instructor after complaining to a coordinator, she has no evidence that the instructor was even informed of the complaint and no evidence that she was treated unfavorably because of it. Even assuming for the sake of argument that reporting the comment was protected activity under Title VII (which is questionable), it is not enough that the instructor could have known about the complaint; the instructor must have had actual knowledge of the complaint in order to show that his actions were motivated by retaliation. *See, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).

Similarly, Foster's claim of disability discrimination fails because she has no evidence that any of the people she complains of knew about her disability. "[A]n employer cannot be liable under the ADA . . . when it indisputably had no knowledge of the disability. This is supported both by simple logic and by the conclusions of other courts that have considered analogous issues." *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)*; see also Spurling v. C&M Fine Pack, Inc.,* 739 F.3d 1055, 1061 (7th Cir. 2014) (referring to "the well-established principle that an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability").

Foster also complains of a "hostile work environment." (Pl.'s Resp. at 15.) In order to prove her claim for a hostile work environment, Foster must show that: (1) her work environment was both subjectively and objectively offensive; (2) the hostile conditions were because of her race, sex, disability, or complaints; (3) the alleged harassment was severe or pervasive; and (4) there is a basis for employer liability. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). In order to succeed on such a claim, the hostility must be "both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (citation omitted).

Foster seems to believe that the SSA was out to get her and that her mentors were attempting to "sabotage [her] ability to perform [her] duties." (Pl.'s Resp. at 11.) Despite this perception, none of the evidence supports Foster's claims that the SSA subjected her to harassment that was severe or pervasive. She received some performance evaluations that offered constructive criticism and some that noted her improvement. She had mentors with whom she worked well (including a white male), and others whose style she found less effective (including an African American female). She was given tutoring, refresher training, and several mentors. Most importantly, nothing in Foster's evaluations or her interactions with trainers or mentors suggests that the comments made or interactions that occurred had anything to do with her race, sex, undisclosed disability, or EEO activity. While Foster may not have liked hearing that she made mistakes or that her performance needed to improve, there is no evidence to support a claim under Title VII or the Rehabilitation Act based on a hostile work environment.

Foster's claim that her treatment, none of which constitutes an adverse employment action, was motivated by race, sex, disability, or retaliation activity has no support in the record. No

reasonable jury could find in her favor. Accordingly, the SSA is entitled to summary judgment. *Steinhauer v. DeGolier*, 359 F.3d 481, 485 (7th Cir. 2004).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [dkt 66] is granted. Judgment is entered for Defendant Carolyn W. Colvin and against Plaintiff Debra A. Foster.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

Dated: March 22, 2016